IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

MELISSA D. HANES,             )
                                    )
       Plaintiff,             )
                                    )
v.                               )    CIVIL ACTION NO.
                               )    04-0365-BH-C
MOBILE INFIRMARY MEDICAL CENTER,  )
WILLIAM S. ROBERTS, CHRIS      )
LAWRENCE, and BARRY JONES,    )
                               )
       Defendants.       )

**FINDINGS OF FACT; CONCLUSIONS OF LAW;
AND ORDER**

This action is before the Court on defendants' respective motions (Docs. 32 and 36) for summary judgment.  Upon consideration of the motions, plaintiff's brief in opposition thereto (Doc. 41), defendants' replies (Docs. 46 and 47), and all other pertinent portions of the record, the Court concludes that the motions are due to be granted.

**FINDINGS OF FACT**

The Court has considered all the evidence of record, both testimonial and documentary, and finds that the following facts are undisputed or uncontradicted by the plaintiff.

### I.  Scott Roberts

1.      On June 7, 2004, the plaintiff, Melissa D. Hanes ("Hanes") filed a multi-count Complaint which included several counts against the individual defendant, Scott

Roberts ("Roberts").[1]  On August 31, 2004, this Court entered an Order (Doc. 19) dismissing all but one of the Counts against Roberts.  The sole remaining claim against this defendant is for Assault under Alabama tort law as set forth in Count II of the Complaint.

2.      Hanes began her employment at Mobile Infirmary Medical Center ("MIMC") in March of 1997 as a student at the University of South Alabama.  (Hanes Dep., Vol. I at 66 and 68, Vol. II at 57).  Hanes left her employment at MIMC on June 9, 2003.

3.      Hanes knew defendant William S. "Scott" Roberts ever since she began her employment in 1997.  (Hanes Dep., Vol. I at 66, Vol. II at 57).  Hanes had no problems with Roberts from 1997 through March of 2002.  (Hanes Dep. Vol. I at 76-77, Vol. II at 57-58).  Neither did Hanes have any problems with Roberts after June 5, 2002.  (Hanes Dep. Vol. I at 83-84, Vol. II at 59).

4.      Even though Hanes testified that Roberts did nothing inappropriate to her in the years 1997 through 2001, she alleges that, after she returned from maternity leave in the Spring of 2002, Roberts inappropriately touched her on two separate occasions.  These are the occasions that she labels as assaults in her Complaint.  (Hanes Dep. Vol. II at 57-58).

---

[1]Hanes has proffered no evidence to support the clearly scandalous allegations she set forth in her Complaint at paragraph 19 concerning Roberts' alleged termination of employment from the University of South Alabama, which Roberts has declared with no uncertainty to be false.  Hanes conceded that she has never spoken with the individual she identified as the student referred to in paragraph 19.  (Hanes Dep., Vol. II at 93).

5.      The first of these alleged touchings occurred around April of 2002 when, according to Hanes, Roberts touched one of her breasts in the respiratory tech room of MIMC.  (Hanes Dep. Vol. I at 78-80, Vol. II at 59-62).  The tech room is a break room that is long and slender with a conference table and chairs where all of the respiratory therapists do their reports.  (Hanes Dep. Vol. II at 60).  Roberts did not say anything to Hanes when this alleged touching took place.  (Hanes Dep. Vol. II at 62).  Nor did Roberts either threaten Hanes in any way or say anything ugly or of a sexual nature.  (*Id*.)

Hanes did not report the incident until July 12, 2002.  (Hanes Dep. Vol. I at 84).

6.      Hanes alleges that the second, and last, incident of touching occurred on June 5, 2002, when Roberts, who was Hanes' supervisor at the time, was reviewing her annual evaluation with her.  (Hanes Dep.Vol. II at 69).  The evaluation took place in an office described by Hanes as follows: "It's a very small office with a desk and a chair for the person who sits at the desk and a chair for whoever comes into the office."  (Hanes Dep. Vol. II at 69-70).  When Hanes came into this office, Roberts was already sitting at the desk; she came in and sat down next to him.  (Hanes Dep. Vol. II at 71).  Hanes alleges that Roberts laid his hand on her leg during the evaluation.  (Hanes Dep. Vol. II at 72).  She then moved her leg and Roberts continued with the evaluation.  (Hanes Dep. Vol. II at 73).

Hanes conceded that Roberts did not touch her leg flesh-to-flesh, he did not crawl his hand up her leg in any way as if he were trying to feel her, he did not squeeze her leg in any way, but, instead, he just "laid his hand on my leg."  (Hanes Dep. Vol. II at 72).

3

7.      Hanes admits that she was free to leave at any time during this evaluation. (Hanes Dep. Vol. II at 74).  Hanes received a good evaluation which she testified she deserved.  (Hanes Dep.Vol. II at 75).

8.      After the evaluation was finished, when Hanes got up to exit the room, Hanes alleges that Roberts got up and reached over to kiss her.  She alleges that she turned her head and his lips landed on her neck.[2]  (Hanes Dep. Vol. II at 78).  Roberts did not touch Hanes with his hands at any point during this alleged kiss.  Likewise, he did not physically hold Hanes or in any way put his arm around her to hug her while trying to kiss her.  (Hanes Dep. Vol. II at 78-79).  Hanes did not slap Roberts, did not say anything to him, and did not report this incident for over one month.  (Hanes Dep. Vol. II at 79-80).

9.      During Hanes' evaluation and the events subsequent to this evaluation, there was never anything in Roberts' tone of voice when talking with Hanes that was angry or

---

[2]Hanes, three times in her brief in opposition to summary judgment, makes the bold misrepresentation that, the day after Roberts' demotion, Roberts kissed her.  (Plaintiff's Opposition Brief at 13, 16, and 20).  The record is clear that Roberts was demoted on July 26 in part as a result of Hanes' contention that he tried to kiss her nearly two months earlier on the undisputed date of her evaluation, June 5, 2002.  Hanes supports these statements with Roberts' deposition statement at which time Roberts was obviously confused by her counsel hopping back and forth among the three complaints in his questioning.  Hanes indeed ignores the fact that this misstated sequence of events was corrected by Roberts later in the same deposition:

      Q       . . . the actual order of events would have been the evaluation of Melissa Hanes
              would have been June the 5th followed by the meeting with Barry Jones
              concerning Karri Evans, is that correct?
      A       That is correct.  I misspoke.  That's correct.

(Roberts Dep. at 69).  Roberts' corrected testimony is consistent with all the other evidence as to the time line of events.

hostile.  (Hanes Dep. Vol. II at 76).  In fact, Roberts has never said anything in anger to Hanes that she can recall during the entire time she has known him or worked with him. (Hanes Dep. Vol. II at 84-85).  Likewise, Roberts has never said anything hostile to Hanes during the entire time she has known him, nor has he ever made any type of a threat to her. (Hanes Dep. Vol. II at 85).

10.     Hanes admits that there is nothing physically violent about the simple kiss that she alleges Roberts gave her at the conclusion of her evaluation.  She admits that she did not go to a doctor or a counselor after the incident.  (Hanes Dep. Vol. II at 81).

11.     During this time period, Hanes was having difficulties in her marriage, including having received threats from her husband to kill her.  (Hanes Dep. Vol. II at 51). Hanes filed charges against her husband for harassing communications.  (Hanes Dep. Vol. II at 48).  In contrast, Hanes never made any calls to law enforcement about Roberts or his conduct.  (Hanes Dep. Vol. II at 88).

12.     According to Hanes, June 5, 2002, was the last time she was subjected to any form of touching by Roberts.  (Hanes Dep. Vol. I at 84, Vol. II at 59).  Hanes did not complain to anyone about the alleged sexual harassment or touching until July 12, 2002, months after some of the alleged occurrences.  (Hanes Dep. Vol. I at 84).

13.     Hanes filed a charge with the EEOC against MIMC in which she does not mention any touching incidents by Roberts.  (Hanes Dep. Vol. II at 97).  Nor does Hanes mention any kiss by Roberts in her EEOC charge.  (*Id*. at 97-98).

14.     As stated initially, Hanes filed the Complaint in this action on June 7, 2004.

## II.  **Mobile Infirmary Medical Center**

1.      The aforementioned Findings of Fact # 1 through 14 are applicable to the

claims asserted against MIMC and are, therefore,  incorporated in this section.

2.      Scott Roberts started his employment with MIMC in 1996 as a respiratory

therapist working part time in the Department of Pulmonary Services.  (Roberts Dep. at 11-

12).  In June 2000, he became a full time employee of MIMC.  In late 2001, he applied for

and was promoted to a supervisory position known as a "team leader" on the 3-11 shift.

(Roberts Dep. at 21).  At some point in early 2002, Roberts became Hanes' team leader.

(Hanes Dep. Vol. I at 71-72).

3.      MIMC requires all new employees to attend an orientation.  (Stembridge

Aff.).  Hanes and Roberts attended such an orientation which includes a presentation by the

Department of Human Resources.  The presentation covers the "Anti Harassment Policy"

which states the purpose of the policy; explains what conduct is not permitted; describes in

detail the complaint/reporting procedures; and also includes suggested guidelines for

reporting the harassment.  (Stembridge Aff).  The policy is available to the employees in

the Personnel Policy Manual located in every department and is also posted on several

employee bulletin boards throughout the hospital, including three on the same floor where

Plaintiff's department is located and another on the walkway to the employee parking

garage. (Stembridge Aff).  The "Anti Harassment Policy" states, in part:

> (1) any employee or agent who is subjected to harassment
> should report such conduct to the Human Resources
> Department.  Such employee should report only to a Human

6

Resources Department Coordinator, Manager, Director or
Vice President.  In the event Human Resources personnel are
not available (e.g., night/weekend shifts) the employee should
report the behavior to any supervising or management
personnel with whom he or she feels comfortable.

(Stembridge Aff., Ex. A).

4.      The Department of Pulmonary Services performs respiratory therapy

services for patients throughout the hospital.  Each therapist is assigned to a certain area

and certain patients for each shift.  They give breathing treatments, do ventilator checks and

assist in various other procedures.  They would receive their assignments and perform their

charting in a common area they refer to as the "tech room".  (Hanes Dep Vol. II at 7-8;

Evans Dep., at pp. 309-10).

5.      Upon Hanes' return from her maternity leave in April 2002, she, by her own

choice, worked 12 to 16 hour shifts either on 7:00 a.m to 7:00 pm shifts or on 7:00 a.m. to

11:00 p.m. shifts.  (Hanes Dep. Vol. I at 72).

6.      Hanes claims against MIMC arise from two alleged incidents of unwelcome

conduct from Roberts, the first occurring in mid-April 2002 and the last occurring on June

5, 2002.

7.      With respect to the first incident, Hanes specifically alleges that, while she

and Roberts were in the break room with another employee, Roberts allegedly walked up

behind her, put his arm on her shoulder and let his hand slide down to her chest, touching

her breast.  According to Hanes, she said to Roberts: "[Y]ou just touched my boob," but he

just went on talking with the other employee.  Hanes repeated her comment, but then just

7

walked away when Roberts again failed to respond and, instead, continued his conversation with the other employee.  (Hanes Dep. Vol. I at 78-81).

8.     With respect to the last incident, Hanes alleges that on June 5, 2002, when Roberts was delivering her performance review in his office, Roberts touched her leg briefly with her hand at which point she moved away and subsequently felt more comfortable.  (Hanes Dep., Vol. I, pp. 82-83).  At the end of the evaluation, when they both stood up, Roberts allegedly tried to kiss her, touching her neck with his lips when she turned away and that he said "you are the only one I kissed today."  (Hanes Dep. Vol. I at 82-83, Vol. II at 71-76).

9.     There were no other incidents of sexually-offensive conduct from Roberts prior to these two events and there were no sexually-offensive incidents subsequent to June 5, 2002.  (Hanes Dep. Vol. I at 83-84).  Hanes did not report either incident until she made a general complaint to her supervisor, Barry Jones, in early July 2002, at the end of a meeting with him about other matters.  According to Hanes "he asked me if I wanted to file a formal complaint and I said no."  (Hanes Dep. Vol. II at 37 and Vol. I at 87-88).

10.     Hanes later reviewed the Anti-Harassment Policy directing her to go to Human Resources and then contacted the Human Resources Director, Randy Stembridge, on or about July 10, 2002.  (Hanes Dep. Vol. I at 97, 100; Stembridge Dep.at 32).  Stembridge interviewed Hanes on July 12, 2002.  (Stembridge Dep. at 32).  He then investigated her claims by interviewing Barry Jones, Scott Roberts and Johnny Miller, the employee allegedly in the break room on the first occasion.  (Stembridge Dep.at 40-41,

59). Stembridge kept in close communication with Hanes throughout the investigation process. (Hanes Dep. Vol. I at 101-102; Stembridge Dep. at 47-49, 51).

11.     Roberts denied Hanes' allegations and Miller denied witnessing anything. (Stembridge Dep. at 40, 61).

12.     In mid June 2002, another respiratory therapist, Karri Evans, had made a complaint regarding offensive conduct by Roberts which was alleged to have occurred between May and June 10, 2002. (Jones Dep. at 18-19)  The complaint was investigated and Roberts was formally counseled on June 18, 2002, regarding inappropriate conduct. (Stembridge Aff. at Ex B).

13.     Even though there were no allegations of harassment by Roberts following his counseling on June 18 and even though Roberts denied all allegations made by Hanes, Stembridge and Jones  removed Roberts from his supervisory position on July 26, 2002, because of the seriousness of the allegations and the perception that some inappropriate activity occurred.  (Stembridge Dep. at 62; Jones Dep. at 30-31).  He was also moved to the day shift (7:00 a.m. to 3:00 p.m.) position where he could be supervised more closely. (*Id.*).  Due to the shift change he lost a shift differential that would roughly equate to a couple thousand dollars a year. (Stembridge Dep. at 73).   Roberts was demoted in title and responsibility.  Due to the demotion he was reduced in his pay grade which reduced the maximum salary he could receive (Stembridge Dep. at 110-111).

14.     While Hanes alleges no other sexually-offensive conduct by Roberts, she complained on two other occasions about Roberts attempting to have conversation with her.

9

Hanes complained that on one occasion in late July 2002 (prior to his demotion), Roberts paged her several times to discuss patient business that she did not believe to be necessary. Hanes admits that Roberts did not attempt personal conversation. (Hanes Dep. Vol. I at 108). Hanes complained that on a second occasion in August, Roberts followed her to her patient's room and asked her if her husband, who was a "best friend" of a member of the rock group Three Doors Down, could get a signed t-shirt to donate to a charity auction. (Hanes Dep. Vol. I at 114). On that same day in August, Hanes testified that Roberts asked her if she needed help with her patients and, later, asked if he could use a cart in the Pulmonary Department. (Hanes Dep. Vol. I at 116). Both of these complaints were addressed when made in that Roberts was cautioned to keep even business conversation with Hanes to a minimum. (Jones Dep. at 48-49). There were no subsequent complaints about Roberts' conduct in any way

     15.    Hanes also alleges that she was retaliated against by Barry Jones and Chris Lawrence for reporting the conduct of Roberts. Her allegations of retaliation include being required to sign a confidentiality policy, reprimands for her absence, hostile meetings with the directors and a bad evaluation. (Hanes Dep. Vol. I at 141-142).

     16.    Hanes alleges that was required to sign a confidentiality policy in September 2002 to prevent her from talking about the Roberts situation. Her own testimony, however, makes clear not only that the MIMC has had a confidentiality policy throughout Hanes employment (Hanes Dep. Vol. I at 184-185 and Ex. 5), but that she signed a confidentiality agreement when she was hired. (Hanes Dep. Vol. II at 8-9 and Ex. 15). The September

10

2002 confidentiality statement differs from the earlier one in that it mentions HIPAA for

the first time. (Hanes Dep. Vol. II at 26 and Exs. 2 and 19). Hanes admits that not only the

employees in her department but all employees in the hospital were asked to sign the

HIPAA confidentiality statement in the fall of 2002. (Hanes Dep. Vol. I at 184-186)

Moreover, Hanes admits that Thomas Hospital, her current employer required her to sign a

similar statement upon her employment there.  (Hanes Dep. Vol. II at 10 and Ex. 17).

      17.     Hanes alleges that two reprimands issued in April and May 2003 relating to

her absences from work were retaliatory.  She was first reprimanded in April for having 156

hours of unscheduled absence.  Although Hanes claims that some of the 156 hours involved

FMLA issues, she admits that approximately 100 of the hours were non-FMLA.[3]  (Hanes

Dep. Vol. I at 195).  Hanes was reprimanded again in May when she had additional

unscheduled absence from the April reprimand. (Hanes Dep. Vol. I at 199-200).  The day

after the May reprimand, however, she first turned in an FMLA form (Hanes Dep. Vol. I at

201 and Ex. 21) and, subsequently, the second reprimand was rescinded. (Hanes Dep. Vol. I

at 201).   Hanes does not dispute that she did not follow policy with respect to her

submission of FMLA forms for the April absence or the February absence.   Hanes has also

admitted that she had been cited for having 80 hours of unscheduled absence the prior year

---

      [3]Hanes conceded that when anyone had an unscheduled absence, the entire shift had to be
covered by another employee, and sometimes more than one employee if the absent employee was
scheduled for a 12 or 16-hour shift.  (Hanes Dep. Vol. I at 166-167).

and that she has been disciplined by her current employer Thomas Hospital for the same problem.  (Hanes Dep. Vol. I at 197).

18.     Hanes complains of "hostile meetings" with Jones and Lawrence relating to work issues but was not reprimanded on any of these occasions.  (Hanes Dep. Vol. I at 156-157).

19.     Hanes also complained that she was selected to serve on a special committee to study department protocols with five other respiratory therapists as well as Barry Jones, Johnny Miller and Scott Roberts.  Hanes admits that her skills may have been the reason she was selected but claims she was being forced to work with Scott Roberts on this project.  When she voiced her objection to working with Roberts on the project, she was not required to participate.  (Hanes Dep.Vol. I at 170, 173).

20.     Hanes never called the Human Resources Department regarding the alleged retaliation by Jones and Lawrence.  (Hanes Dep. Vol. I at 183-184).

21.     Hanes decided to apply for a job at Thomas Hospital on May 19, 2002, After the reprimand she received regarding her 156 hours of unscheduled absence.  (Hanes Dep. Vol. I at 202 and Ex. 10).  Hanes received an offer of employment from Thomas,  made the decision to accept the job but did not turn in her resignation, prior to her performance review at MIMC in June 2003.  (Hanes Dep. Vol. I at 211).  In other words, according to Hanes, "she knew she was going to quit when she walked in" her performance review with Barry Jones in June of 2003.  (Hanes Dep. Vol. I at 211).

12

22.     Hanes alleges that the June 2003 performance review was retaliatory because it was given by Barry Jones, the Director of the Department and took longer than normal. (Hanes Dep. Vol. I at 207-208).  However, the evaluation only had to be split into two sessions because Hanes had a personal domestic court date that prevented her from completing the review on the first day it was scheduled.  (Hanes Dep. Vol. I at 208-209).  In the middle of the review on the second day, Hanes resigned rather than wait and turn in her notice later.  (Hanes Dep. Vol. I at 210).

23.     Finally, Hanes claims she has heard rumors that Roberts had harassment issues during his employment at USAMC.  She admits, however, that she does not know of any management employees at MIMC that had any knowledge of any alleged harassment issues involving Roberts at any other employer.  (Hanes Dep. Vol. I at 220-221).

## CONCLUSIONS OF LAW

1.     **Summary Judgment Standard**

Defendants are entitled to summary judgment "if the pleadings, depositions, answers to interrogatories and . . . affidavits . . . show that there is no *genuine* issue as to any *material* fact and that [the defendants are] entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)  (emphasis added).  Under Rule 56(c):

> A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. A fact is "material" if it might affect the outcome of the suit under governing substantive law.

*Beck v. Somerset Technologies, Inc.,* 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Where the record taken as a whole

could not lead a rational trier of fact to find for [the plaintiffs], there is no genuine issue for

trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Summary judgment is appropriate if the plaintiff fails to produce sufficient evidence to

raise a genuine issue of material fact on the existence of an essential element of their

claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986*); Manor Healthcare Corp.

V. Lomelo,* 929 F.2d 633, 636 (11th Cir. 1991). In considering defendants' motions for

summary judgment, the Court views the facts presented, together with all reasonable

inferences arising from the facts, in the light most favorable to the plaintiffs. *Adickes v.

S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Cooper v. Southern Co.*, 390 F.3d 695, 723

(11th Cir. 2004). As the moving party, the defendants have the initial burden of showing the

absence of a genuine issue of material fact. *Id.* Once the defendants make that showing,

the burden shifts to the plaintiff to "come forward with *specific* facts showing that there is a

genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87 (1986).

Confronted with a properly supported motion for summary judgment, the plaintiff must

adduce admissible evidence which creates a material factual dispute. *Clarke v. Coats &

Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Plaintiff must do more than "simply show

there is some metaphysical doubt as to the material facts." *Anderson,* 477 U.S. at 251-52.

She must produce evidence. *Id.*

2.      __Scott Roberts - Assault/Battery Claims__

     A.      **Hanes claims prior to June 5, 2002, are barred.**

The Court first concludes that Hanes' claims for assault/battery relative to the first alleged incident of touching in April of 2002, is barred by the applicable statute of limitations.  The Code of Alabama provides that "all actions for an injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years."  Ala. Code § 6-2-38(1).  The applicable statute of limitations for a claim of assault/battery is two years.  *Wright, supra,* 654 So.2d at 544.  Consequently, only the incident alleged to have occurred on June 5, 2002, must be addressed on its merits, and only because June 5, 2004 fell on a Saturday and Hanes' filing of her Complaint on the subsequent Monday, June 7, 2004, was thus within the statutory deadline.

Hanes contention that the limitations period as to the first alleged incident was somehow tolled by the EEOC proceedings is unsupported by law and entirely without merit.  It is well-established that the statute of limitations for a plaintiff's state law claims is not tolled while the plaintiff is pursuing administrative remedies with the EEOC.  *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 466 (1975) (limitations period for § 1981 claim not tolled during the time the EEOC conducted an administrative hearing on the Title VII claim as the two claims are separate and distinct); *Gonzalez v. Firestone Tire & Rubber Co.,* 610 F.2d 241 (5th Cir. 1980) (filing of a charge with the EEOC does not toll statute of limitations applicable to a § 1981 claim based on same discriminatory

events);*Gardner v. St. Bonaventure Univ.*, 171 F. Supp.2d. 118, 131 (W.D.N.Y.2001)

(refusing to toll the statute of limitations for state law claims during pendency of EEOC

proceeding); *Stordeur v. Computer Associates Int'l, Inc.*, 995 F. Supp. 94, 99

(E.D.N.Y.1998) (same).

      **B.**     **Roberts is entitled to summary judgment in his favor.**

      In order to succeed on her assault claim against Roberts, Hanes must establish: (1)

that Roberts touched her; (2) that Roberts intended to touch her; and (3) that the touching

was conducted in a harmful or offensive manner.  *Ex parte Atmore Community Hosp.*, 719

So.2d 1190, 1194 (Ala. 1998).   A successful assault becomes a battery, which consists of

the touching of another in a hostile manner. *Wright v. Wright*, 654 So.2d 542, 544 (Ala.

1995), *citing*, *Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala.1986), and *Singer*

*Sewing Machine Co. v. Methvin*, 184 Ala. 554, 561, 63 So. 997, 1000 (1913).  A key

element of the tort of battery is that "the touching was conducted in a harmful or offensive

manner." *Atmore Community Hosp.*, 719 So.2d at 1194.  The Alabama Supreme Court

noted that, in order to establish that the defendant committed a battery, there must be

substantial evidence that the alleged touching occurred with sexual overtones and was

unwelcome.  (*Id.*).

      There is no evidence in this case that the alleged touching of Hanes by Roberts on

June 5, 2002, was conducted with any offensive sexual overtones.  The only evidence

proffered by Hanes is that, while they sat next to each other during Roberts' evaluation of

Hanes, he briefly placed his had on her leg and then, after they stood up at the conclusion of

their conversation, he attempted to kiss her but she turned her head and his lips landed on her neck.  Roberts did not touch Hanes with his hands at any point during this attempted kiss.  Hanes did not slap Roberts or say anything to him.  Nor did Hanes report the incident to anyone for over a month, and then only in a general manner.

The Alabama Supreme Court has also held that the "manner or spirit" in which the touching occurs is critical as to whether the tort of assault exists.  *Harper v. Winston County*, 892 So.2d 346, 353 (Ala. 2004).  Unlike *Harper*, there is no evidence in this case that the alleged touching on June 5, 2002, was done in an angry, revengeful, rude, insolent, or violent manner.  There is simply no evidence to support a contention that Roberts' conduct constituted a battery.

The Court must also agree that Hanes' failure to complain or otherwise protest Roberts' alleged conduct at the time it occurred suggests that she did not, for whatever reason, perceive the conduct as offensive at the time.  *See e.g.*, *Paraohao v. Banker's Club, Inc.*, 225 F.Supp. 2d 1353, 1359 (S.D. Fla. 2002)("The correct inquiry is whether the [plaintiff] by her conduct indicated that the [complained--of behavior] was unwelcome."), *quoting*, *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986). In the present case, Hanes neither reported the incident for over a month but she never advised Roberts in any manner that his conduct was unwelcome.  There is no evidence in this record to support the contention that Hanes subjectively believed at the time Roberts' conduct occurred that it was offensive or that she perceived it to be "sexually harassing."

Roberts is entitled to summary judgment in his favor on the assault/battery claim.

17

3.      **Mobile Infirmary Medical Center - Hostile Work Environment Claim**

Hanes does not challenge MIMC's assertion that she has presented no evidence of

*quid pro quo* harassment, namely harassment by Roberts which resulted in a tangible

employment action such as discharge, demotion or undesirable reassignment.  *See e.g.*,

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)("Defined tangible

employment action as one that "constitutes a significant change in employment status, such

as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits.").  *See also*, *Lindsey*

*v. Burlington Northern Santa Fe Railway Co.,* 266 F. Supp. 2d 1338, 1344 (N.D. Ala.

2003)("An adverse employment action, for purposes of Title VII liability, involves 'a

serious and material change in the terms, conditions, or privileges of employment'."),

*quoting*, *Davis v. Town of Lake Park, Fla.,*  245 F.3d 1232, 1239 (11th Cir. 2001).

Hanes, according to her arguments in opposition to defendants' motions for summary

judgment, essentially concedes that she is asserting a claim under Title VII for a hostile

environment.

In *Miller v. Kenworth of Dothan*, 277 F.3d 1269, 1275 (11th Cir. 2002), the

Eleventh Circuit set forth the elements necessary to support a hostile environment claim:

> Title VII of the Civil Rights Act of 1964 prohibits employers from
> discriminating "against any individual with respect to his
> compensation, terms, conditions, or privileges of employment,
> because of such individual's race, color, religion, sex, or national
> origin." 42 U.S.C. § 2000e- 2(a)(1). A hostile work environment claim
> under Title VII is established upon proof that "the workplace is
> **permeated with discriminatory intimidation, ridicule, and insult,**

18

> *that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment*." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). This court has repeatedly instructed that a plaintiff wishing to establish a hostile work environment claim show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the *harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment*; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

277 F.3d at 1275 (emphasis added).  *See also*, *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999) (applying these factors in the context of a hostile environment sexual harassment claim).  The EEOC Guidelines describe the kinds of workplace conduct that may be actionable under Title VII as "sexual harassment" to include "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986), *quoting*, 29 CFR § 1604.11(a) (1985).  The Guidelines further provide, however, that such sexual misconduct constitutes prohibited "sexual harassment" only "where 'such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment'." *Id.*, *quoting*, 29 CFR § 1604.11(a)(3).

Consequently, the fourth element, whether the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment," is the element that tests the legitimacy of most harassment

19

claims and is therefore regarded as crucial. *See, Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *citing,  Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).    Only when the workplace is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the [employee's] employment and create an abusive working environment," is the law violated. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993), *quoting*, *Meritor*,  477 U.S. at 67.

The employee must, therefore,  make both a subjective and an objective showing in order to establish that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment.   *Mendoza*, 195 F.3d at 1246. The employee must establish not only that she subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive. *Gupta*, 212 F.3d at 583, *citing*, *Mendoza*, 195 F.3d at 1246. The objective severity of harassment should be judged from the perspective of a reasonable person in the employee's position, considering all of the circumstances. *Mendoza*, 195 F.3d at 1246, *citing*, *Oncale v. Sundowner Offshore Services, Inc*., 523 U.S. 75, 81 (1998).

In determining whether the harassment objectively altered an employee's terms and conditions of employment, the following four factors should be considered: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the

conduct unreasonably interferes with the employee's job performance.  *Id.   Mendoza*, 195

F.3d at 1246, *citing*, *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir.1997).  The

conduct must be examined in context, not as isolated acts, and the severity and

pervasiveness of the conduct it must be judged under the totality of the circumstances.

*Allen*, 121 F.3d at 647.  *See also*, *Harris*, 510 U.S. at 23; *Henson*, 682 F.2d at 904;

*Faragher*, 524 U.S. at 787-88.

      Although the Court would agree that the nature of some of the conduct about which

Hanes complains, namely that Roberts alleged touching of her breast in the tech room,

placing of his hand briefly on her leg during her evaluation, and attempting to kiss her at the

conclusion of the evaluation, cannot honestly be characterized as "normal day-to-day

interactions between members of the opposite sex," the alleged crudeness of the reported

behavior does not itself establish that the conduct was either harassing within the meaning

of the law or sufficiently severe or pervasive so as to alter the plaintiff's  terms or

conditions of employment.  Whether or not Hanes agrees, the law is clear that not all

offensive conduct, however inappropriate or vulgar, is unlawful conduct.  *See e.g., Jones v.

Clinton*, 909 F. Supp. 657, (E.D. Ark. 1998) (hand on leg moving towards pelvis, attempted

kiss and exposure of genitals, "while boorish and offensive" . . . is not so severe and

pervasive . . . to have altered condition of employment and created an abusive

environment.).   To cross the line to unlawful conduct, offensive conduct  must be

sufficiently severe and pervasive to alter the conditions of employment and create an

abusive working environment.  *Meritor,* 477 U.S. at 67.  The two, sporadic incidents

21

complained of by Hanes, occurring in her five years of working with Roberts, do not cross the line under this analysis.  Compare the following authorities which failed to find an unlawfully hostile environment under factual allegations similar or far worse than those made by Hanes:  *Hockman v. Westward Comm. LLC*, 122 Fed.Appx. 734, 2004 WL 2980351 (5th Cir. 2004) (grabbing breasts and "behind" not severe conduct).  *Meriweather v. Caraustar Packaging Co.*, 326 F.3d 990 (8th Cir. 2003) (grabbing buttocks "with force" did not satisfy high threshold of actionable hostile environment); *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993) (placing hand on leg above the knee, rubbing upper thigh, kissing and lurching at her did not create an objectively hostile environment).  *See also Mendoza v. Bordon,* 195 F.3d 1238, 1246-47 (11th Cir. 1999) (detailing additional cases).

      As applied to the case at bar and as stated above, Hanes' failure to complain or otherwise protest Roberts' alleged conduct for over a month after it occurred suggests that she did not, for whatever reason, perceive the conduct as offensive at the time.  *See e.g.*, *Paraohao v. Banker's Club, Inc.*, 225 F.Supp. 2d 1353, 1359 (S.D. Fla. 2002)("The correct inquiry is whether the [plaintiff] by her conduct indicated that the [complained--of behavior] was unwelcome."), *quoting*, *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986). In the present case, Hanes did not complain about Roberts' conduct for over a month after the last alleged "offensive" conduct occurred.  Moreover, she never advised Roberts in any manner that his conduct was unwelcome.   There is no evidence in this record to support the contention that Hanes subjectively believed at the time Roberts'

conduct occurred that it was offensive or that she perceived it to be "sexually harassing."
Hanes own description of the incidents demonstrates that she was physically threatened or
humiliated by Roberts' alleged conduct. (Hanes Dep. Vol. I at 34, Vol. II at 84-85).

The courts which have analyzed similar complaints have consistently found such
conduct to be below the threshold required to demonstrate an unlawful hostile environment.
In *Gupta v. Florida Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000), the plaintiff
complained of several incidents of alleged sexual harassment including an occasion when
"he just rolled his chair and came close to me and put his hand on my right thigh" and
another when he rolled his chair toward the plaintiff and said "what kind of material is that?"
as he lifted the hem of her dress about four inches.  She claimed the supervisor called her at
home repeatedly asking questions about her personal life .  There were also other reported
comments made during the same time period that the plaintiff felt were inappropriate and
contributed to the hostile environment.  All of the statements and actions about which she
complained occurred during a period of six or seven months.  *Id.* at 579.  After examining
the totality of the circumstances reported by the plaintiff in *Gupta*, the Eleventh Circuit
found that no hostile work environment was created by the supervisor.   The court noted that
during the entire period the plaintiff and supervisor were interacting, each incident was only
momentary and neither alleged incident of touching was coupled with any verbal
suggestions or advances.  The Eleventh Circuit in *Gupta* held:

> . . . we conclude the conduct and statements in question would not have
> interfered with a reasonable employee's performance of her job. . . . the
> alleged harassment in this case exemplifies "the ordinary tribulations of the

workplace," which the Supreme Court and this  Court have held do not
constitute actual sexual harassment. [The plaintiff] failed to present evidence
that [the defendant's] conduct was in any way physically threatening or
humiliating," or that a reasonable person would view the conduct as "severe."

(Citations omitted).  *Id.* at 586.

        The conduct about which Hanes complains was not severe.  The alleged "touching"

occurred only for a moment on two occasions and a single attempt to give her a kiss.  The

conduct was never coupled with any sexual statements or innuendoes.  As recognized in

*Gupta*:

        [The supervisor] should not have done these things.  But those were only two
        incidents in a period of six or seven months during which they were
        interacting out of an even longer period during which the two worked at the
        University.  Each incident was only momentary, and neither was coupled with
        any verbal suggestions or advances.

*Gupta,* 212 F.3d at 585.  Roberts never propositioned Hanes nor did he ever make any

suggestion that she had to perform any sexual act in order to keep her job or receive good

evaluations.    Any reasonable person, male or female, would not find the conduct that

purportedly occurred to be severe or pervasive.  See *Hockman v. Westward Comm., LLC*,

2004 WL 2980351 (5th Cir. 2004) (grabbing or brushing breasts and "behind" not severe

conduct).  See *Meriweather v. Caraustar Packaging Co.*, 326 F.3d 990 (8th Cir. 2003)

(allegations including grabbing buttocks "with force" didn't satisfy high threshold of

actionable hostile environment).

        There is certainly no evidence in this record that it affected in any way the

performance of her job. See also *Davis v. Baroco Electrical Construction Co.*, No. CIV. A.

99-1055-S, 2000 WL 33156436 (S.D.,  Ala. Dec. 15, 2000), (two or three sexual remarks

a day and four incidents of physical conduct not shown to interfere with plaintiff's job, fell

24

short of actionable hostile environment sexual harassment). There is neither a contention nor evidence proffered that Hanes' excessive absences, the principal failing on her evaluations, was in any way associated with Roberts' conduct or MIMC's handling of Hanes' complaint regarding same. Just as the Southern District of Alabama held in *Davis*, without a showing that the conduct affected the plaintiff's job performance, the plaintiff's claim falls short of actionable hostile environment sexual harassment. *Davis*, 2000 WL 33156436, at *6-7.

　　　　Even if it could be said that Hanes demonstrated an unlawful hostile environment, she cannot prevail because there exists no genuine issue that MIMC "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and that Hanes "unreasonably failed to take advantage of any preventative or corrective opportunities . . . or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  It is undisputed that the anti-harassment policy was reviewed in orientation, is available in each department and is posted on various bulletin boards.  In enacting, enforcing and disseminating the anti-harassment policy, MIMC "exercised reasonable care to prevent harassment."  *See Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548 (11th Cir. 1997).

　　　　Whether or not Hanes agrees with MIMC's response to her complaint, or to its response to the complaints of her co-workers, it is undisputed that MIMC reacted immediately to each complaint, investigated it and took action to correct the behavior: Initially with Karri Evans, Barry Jones conducted an investigation, called several meetings, formally counseled  Roberts and documented the action in Roberts' file.  With Hanes, Randy Stembridge launched an investigation, interviewed a number of witnesses and in conjunction with Jones decided to remove Roberts from his supervisory role and to a shift

where he could be more closely supervised.  MIMC thus "exercised reasonable care to correct promptly any alleged sexually harassing behavior."

The record is clear that Hanes unreasonably failed to take advantage of preventative opportunities to avoid harm.  She failed to report the first objectionable conduct for two months.  Her only excuse was that she was afraid to report it but she offers no basis for her fears.  The Court agrees that this is insufficient to excuse failure to follow a policy. *Walton v. Johnson & Johnson Services, Inc.*, 347 F.3d 1272, 1288 (11th Cir. 2001).

When Hanes finally reviewed the Anti-Harassment Policy and followed it in reporting her complaint to Human Resources, it was promptly investigated and resolved. More importantly, when the alleged offensive conduct by Roberts was reported it was stopped.  As recognized in *Faragher*:

> If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.

*Faragher*, 524 U.S. at 807.  As in *Madray v. Publix Supermarkets*, 208 F.3d 1290 (11th Cir. 2000), the evidence reflects that Hanes unreasonably delayed utilizing the employment procedures and must concede that MIMC "responded promptly once [she] cooperated by providing the company notice via its established complaint procedures."  MIMC has established the second prong of the *Faragher* defense.  Accordingly, MIMC has no liability for the alleged wrongs of Roberts occurring prior to the time it was notified of the alleged behavior.  *See Madray, supra*, at 1302.  .

Hanes argues that MIMC's response constituted nothing more than a "fraudulent demotion" of Roberts.  Hanes' reasoning is mere sophistry.  It is undisputed that Roberts was removed from his team leader position and ceased to supervise Hanes (or her co-

26

workers, Evans and Simmons).  It is undisputed he lost shift differential and was moved to day shift where he could be more closely supervised.  All of these actions were taken to prevent any further claims of inappropriate conduct.  Hanes conceded that these corrective measures were successful.

That Roberts received a transfer involving a raise when two years later there had been no further claim of offensive conduct is a non-issue.  (Roberts Dep., p. 23).  The evidence of record establishes that: (1) Roberts still was not supervising anyone, particularly the complainants against him, (Roberts Dep., p. 25); and (2) the law does not require that an accused unconfessed harasser never be given the right to earn his way back into his employer's good graces with a clean record and strong job performance. While it is clear that Hanes does not believe Roberts was sufficiently punished, she cannot dispute that MIMC's actions corrected the purported problem.  As recognized by the Eleventh Circuit in *Farley v. American Cast Iron Pipe Co.*, 115 F.3d 1548 (11th Cir. 1997).

> Although Farley remains unsatisfied with ACIPO's resolution of her complaint, we have never stated . . . that a complainant in  a discrimination action has a right to the remedy of her choice.

*Id.* at 1555.

4.      **<u>Mobile Infirmary Medical Center - Retaliation Claim</u>**

A.      **Pending discharge.**

To establish a prima facie case of retaliation under Title VII, Hanes must prove the following:  (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; (3) there is causal connection between the participation and the protected activity and the adverse employment decision.  *Gupta v. Florida Bd. of*

*Regents,* 212 F.3d 571, 587 (11th Cir. 2000) (citing *Farley v. Nationwide Mut. Ins.,* 197 F.3d 1322, 1336 (11th Cir. 1999)).  Hanes failed to prove both that she suffered an adverse employment action and that there is a causal connection between the participation and the protected activity in any alleged adverse employment decision.

The acts that Hanes claims comprised "retaliation" for reporting Roberts are not sufficient to rise to the level of tangible or adverse employment actions.  Her list of alleged retaliatory conduct includes: being required to sign a confidentiality policy, reprimands for her absences, hostile meetings with the directors, and a bad evaluation. (Hanes Dep. Vol. I at 141-142).  Nothing in Hanes' description of the alleged transgressions against her after she reported Roberts' conduct amounts to an "adverse employment action" sufficient to establish a retaliation claim.  *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).  The courts have defined "adverse employment action" as requiring an "ultimate employment decision" *id*. or a serious and material change in the terms, conditions or privileges of employment.  *Davis v. Town of Lake Park*, 245 F.3d 1232 (11th Cir. 2001).

An adverse employment action must constitute "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998).  In *Merriweather v. Alabama Dept. of Public Safety,*  17 F. Supp. 2d 1260, 1274 (M.D. Ala. 1998), *aff'd* 199 F.3d 443 (11th Cir. 1999), the plaintiff alleged that in retaliation she was given negative job evaluations, written counseling statements and limitations on assignments.  The court dismissed the claim on summary judgment, concluding:

28

> Merriweather has alleged no loss of pay, benefits, job classification, or
> change of duties as a result of this alleged retaliation.  Considering this
> evidence in the light most favorable to the plaintiff, this court finds that the
> evidence is insufficient to support...an adverse employment action.

17 F.Supp. at 1274-76.  The court held that an employment action involving no appreciable

change in working conditions simply cannot constitute an adverse employment action.  17

F. Supp. 2d at 1276.  "Otherwise, every trivial personnel action that an irritable, chip-on-the

shoulder employee did not like would form the basis of a discrimination suit." *Whitehead*

*v. Norfolk S. Ry.,*  53 F.Supp. 2d 1380, 1383 (M.D. Ga. 1999) (quoting *Williams v. Bristol-*

*Myers Squibb Co.,* 85 F.3d 270-74 (7th Cir. 1996)).

Hanes specifically described her complaints of retaliation as follows:

> I received a confidentiality policy that I had to sign that was banning me to
> speak to anybody.  I also had . . . reprimands after that point and also had a bad
> evaluation.  I had meetings with Chris and Barry and Chris and Barry together
> that were hostile.

(Hanes Dep. Vol. I at 141).  In her  deposition, Hanes also complained about numerous

other minor incidents where her performance was challenged or corrected.  She admits,

however, that she was not written up for these incidents, thus they do not establish "ultimate

employment decisions."  (Hanes Dep. Vol. I at 157, 164).

The new confidentiality policy was required to be signed by all employees in the fall

of 2002, not just Hanes, and corresponded with the implementation of HIPAA compliance.

(Hanes Dep. Vol. I at 184-186).  These acts complained of by Hanes are not sufficient to

qualify as tangible employment actions.  In considering similar allegations and "demeaning"

comments, the court in *McDaniel v. Merlin Corp*., 2003 WL 21685622 (N.D. Ga. 2003)

recognized that "changes that cause no materially significant disadvantage to an employee

are not actionable." *See also Hockman v. Westward Communications, LLC*, 2004 WL

29

298035 (5th Cir. 2004) (hostility, directives not to be sick, etc., not adverse employment actions supporting retaliation claim).  Hanes has, therefore, failed to show that there were any retaliatory actions taken against her which constituted a tangible employment action sufficient to demonstrate a prima facie case of retaliation.

### B.   Constructive Discharge Claim

The final element of retaliation claimed by Hanes is that she was constructively discharged.  However, she has failed to present sufficient evidence to support such a claim. "A constructive discharge occurs when a discriminatory employer imposes working conditions that are 'so intolerable that a reasonable person [in the employee's] position would have been compelled to resign'" *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 978 (11th Cir.2003) (quoting *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997)).  In *Pennsylvania State Police v. Suders*, 524 U.S. 129, 124 S.Ct. at 2342 (2004), the United States Supreme Court set forth the elements of a constructive discharge under Title VII:

> To establish constructive discharge, the plaintiff must make a further showing:  She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response.

*Suders*, 124 S.Ct. at 2347.  "Mere harassment, alone, is insufficient ; rather, the plaintiff must show 'aggravating factors' to justify departure."  *Hockman v. Westward Comm., LLC*, 122 Fed. Appx. 734 (5th Cir. 2004).

Hanes asserts that she received undeserved poor evaluation; undeserved blame and retaliation in the form of verbal and written harassment from Defendants for the tension and unfriendly environment in the department; she was forced to give one-on-one reports to Defendant Roberts; she endured verbal abuse from Jones; and she was unjustly reprimanded

30

for time taken off from work.  (Compl. ¶ 25(A-E)).  Hanes failed, however, to demonstrate

any tangible action that was taken that would force a reasonable person to resign their

position.  The Fifth Circuit in *Hockman* listed factors that would be sufficient to find

constructive discharge:

> Such factors include: (1) demotion; (2) reduction in salary; (3) reduction in
> job responsibilities; (4) reassignment to menial or degrading work; (5)
> reassignment to work under a younger supervisor; (6) badgering, harassment,
> or humiliation by the employer calculated to encourage the employee's
> resignation; or (7) offers of early retirement or continued employment on
> terms less favorable than the employee's former status.

*Id.*  None of these things were claimed by Hanes.  In *Durley v. APAC, Inc.*, 236 F.3d 651,

658 (11th Cir. 2000), the Eleventh Circuit held that claims by the plaintiff that she was

harassed regarding her absences and tardiness, treated poorly by fellow employees, and that

she received a smaller raise than her contemporaries was not sufficient to support a claim

of constructive discharge.  In *Pipkins v. City of Temple Terrace, Florida*, 267 F.3d 1197,

1201 (11th Cir. 2001)(summary judgment affirmed), the Eleventh Circuit held that

"repeatedly receiving poor evaluations would be unpleasant for anyone, but it does not rise

to the level of such intolerable conditions that no reasonable person would remain on a

job." As noted above and of particular importance in this case, one of the principal reasons

for Hanes' poor evaluations in her excessive absences, which she does not dispute.  There

is no contention that these absences were in any way related to Roberts' conduct or

MIMC's response to Hanes' complaints about same.

     In addition, there is evidence in this case to show that Hanes had already decided to

leave her employment with MIMC prior to the time she resigned her position.  In her sworn

deposition testimony she stated:

        Q.     And by June 9th you knew you had the job at Thomas, didn't you?

A.    I don't - - I think we had - - I don't think I had accepted the job.  I'm
       not sure when I accepted it.
Q.    But the offer had already been made by the time - -
A.    Yeah.
Q.    - - you left the evaluation?  Why didn't you just skip the evaluation
       process?
A.    Well, I wanted to give my two-week notice.  I had not planned to start
       work at Thomas Hospital until June 26th.  I was going to give my two-
       week notice after that evaluation.
Q.    Okay.  So you knew you were going to quit when you walked in the
       evaluation?
A.    Yes.

(Hanes Dep. Vol I at 211).  Hanes claims that she was forced to quit due to the harsh

treatment by her supervisors, particularly during her last evaluation.  The fact that Hanes had

already decided to quit prior to the evaluation demonstrates that the reason she quit was not

due to the conditions she was working under, but in fact because she had already acquired

employment elsewhere.  As Hanes has failed to present sufficient evidence to support her

Title VII retaliation claim, MIMC is entitled to a judgment in its favor on such claim as a

matter of law.

     5.    **Mobile Infirmary Medical Center - State Law Claims**

        A.    **Negligent Supervision, Training and Retention Claim**

Hanes asserts a cause of action against MIMC for negligent supervision of Roberts,

which is based upon her allegation that MIMC's "failure to adequately supervise Roberts

caused and allowed the sexual harassment by Roberts of Plaintiff to occur."  (Pl.'s Compl.

¶ 44).  Hanes also asserts claims against MIMC for "Negligent Hiring, Training and

Retention of Roberts."  In Count V of the Complaint, the Plaintiff asserts that MIMC

negligently supervised Roberts since no action was taken to:

A.    Sufficiently discipline Roberts for his conduct towards the Plaintiff;
       and/or

B.      Sufficiently separate Roberts from Plaintiff; and/or

C.      Create, disseminate, and enforce an adequate policy prohibiting
         gender discrimination, sexual harassment and/or retaliation, and
         provide no formal or informal training to supervisory employees;
         and/or

D.      Cause Roberts to understand that gender discrimination and/or
         retaliation was against the law and to obey that law; and/or

E.      Cause Roberts to understand that gender discrimination and/or
         retaliation would not be tolerated at Mobile Infirmary Medical Center;
         and/or

F.      Train its employees in proper follow-up and investigation techniques
         to be utilized in gathering evidence of discrimination and harassment
         in the workplace; and/or

G.      Train supervisors in proper reporting procedures to be implemented
         upon encountering evidence of employment discrimination and
         harassment in the workplace; and/or

H.      Train supervisors in what remedial action was available and
         appropriate upon encountering evidence of employment
         discrimination and harassment in the workplace.

(Pl.'s Compl. at ¶ 59(A-H)).  In that same count, Hanes alleges that MIMC failed to train

and supervise its employees that discrimination and retaliation would not be tolerated.

According to Hanes, this resulted in her suffering sexual harassment from Roberts.

       In order to establish a prima facie case for negligent hiring, training, supervision or

retention, Hanes must:

       [Affirmatively show] that had the master exercised due and proper diligence,
       the master would have learned of the incompetency.  This may be done by
       showing specific acts of incompetency and showing that they were brought to
       the knowledge of the master, or by showing them to be of such a nature,
       character, and frequency that the master, in the exercise of due care, must
       have had notice of them.

*Mardis v. Robbins Tire & Rubber Co.*, 669 So. 2d 885, 889 (Ala. 1995).  In the present

case, Hanes has failed to show that MIMC was aware of any alleged incompetence of

Roberts that would support a claim for negligent supervision.

33

In *Mardis,* the plaintiff alleged that her employer was liable for negligent supervision and training in that it failed to train its supervisory personnel in handling sexual harassment complaints and providing a means for employees to present their complaints. The claims were based on the allegations that the plaintiff experienced sexual harassment at the hands of a co-employee. The plaintiff quit her job the day after the alleged sexual harassment was reported to her employer. The court held that the plaintiff had not shown that the employer had knowledge of the alleged incompetency of her co-employee until she reported the sexual harassment. *Id.* at 890. She could not have suffered any damages after the employer became aware of the incompetency due to the fact she quit her employment the next day. The employer was not liable for any actions which caused her damage prior to their knowledge of the incompetence. *Id.*

As applied to the case at bar, Hanes cannot hold MIMC liable for any damages that resulted from actions of Roberts prior to the time they became aware of the alleged incompetence of Roberts. Hanes, herself, had worked with Roberts since 1997. By her own admission, she did not experience, any problems with sexually harassing conduct until April 2002. (Hanes Dep. Vol. I at 83-84). There is no evidence that anyone had reported inappropriate conduct by Roberts prior to the complaint made by Karrie Evans on June 15, 2002. Although Hanes made a general complaint to her supervisor, Barry Jones, in early July 2002, she did not make a formal complaint as required by the Anti-Harassment Policy until July 10, 2002. (Hanes Dep. Vol. I at 97, 100; Stembridge Dep. at 32). The last incident of alleged sexually harassing conduct by Roberts towards Hanes occurred on June 5, 2002. There were no further incidents after action was taken by MIMC in response to the allegations of the Plaintiff. (Hanes Dep. Vol. I at 107). The last time Hanes endured

any offensive conduct by Roberts was prior to the time she reported any harassment to MIMC.

MIMC is not liable for any actions that occurred prior to the time they gained knowledge of the alleged incompetency of Roberts.  All alleged incidents, according to Hanes own testimony, occurred prior to that time.  Therefore, MIMC is not liable to Hanes for negligent supervision, training, retention or hiring.

Moreover, MIMC cannot be held liable for negligent training and/or supervision unless the Plaintiff proves the underlying torts of sexual harassment.  In *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (Ala. 2000), a jury found that the defendant employee was not liable for any tort, but that the employer was liable for negligent supervision and training.  The Supreme Court of Alabama reversed the jury's verdict holding that it was an inconsistent verdict stating:

> But, [the employer] cannot be held liable for authorizing or ratifying conduct that, according to the jury, did not occur.  Accordingly, a verdict against [the employer] based on a finding of negligent training and supervision would be inconsistent with a verdict exonerating [the employee].

*Id.* at 825.  Furthermore, the Alabama Supreme Court has held that a plaintiff is required to prove an underlying common-law tort in order to prevail in a claim for negligent supervision, training or retention.  *Univ. Fed. Credit Union v. Grayson*, 878 So. 2d 280, 291 (Ala. 2003); *Voyager Ins. Co. v. Whitson*, 867 So. 2d 1065, 1073 (Ala. 2003); *Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (Ala. 1999).  The claim of sexual harassment is not sufficient in order to support the claim.  In *Thrasher v. Ivan Leonard Chevrolet*, 195 F. Supp. 2d 1314, 1319 (N.D. Ala. 2002), the Northern District of Alabama held:

> In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a common-law Alabama tort. As Alabama does not recognize a common-law tort for sex discrimination in employment, the Court finds that Plaintiff cannot maintain an action for negligent supervision, training, and/or retention based upon conduct that is employment discrimination, but does not support a common law tort.

*Id.* In the present case, Hanes' claims of sexual harassment, even if proven to be true, are not sufficient to support a claim for negligent supervision, training and/or retention. As the assault claim is also due to be dismissed, as discussed above, it cannot provide the basis to support a claim for negligent supervision, training or retention. In order to hold MIMC for the actions of Roberts, Hanes is required to first prove by a preponderance of the evidence that Roberts did, in fact, commit the alleged torts she asserts in her complaint. This she has failed to do. Accordingly, MIMC is entitled to summary judgment in its favor as a matter of law as to Hanes' claim of negligent supervision, hiring and retention of Roberts.

### B.      Assault/Battery Claim

Hanes makes allegations of two incidents of alleged assault by Roberts. The first occurred in mid-April 2002. For the reasons stated above, the only alleged incident that is not barred by the applicable two year statute of limitations is the incident which occurred on June 5, 2002. In order to hold MIMC liable for the alleged June 5, 2002 assault/battery by Roberts, Hanes must first present sufficient evidence that the assault/battery actually occurred. Again, for the reasons stated above, she has failed to do so.

Moreover, assault is classified as an intentional tort. *See Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (Ala. 2000). "For an employer to become liable for the intentional torts of its agent, the plaintiff must offer evidence that (1) the agent's wrongful acts were in the line and scope of his employment; or (2) that the acts were in furtherance

of the business of the employer; or (3) that the employer participated in, authorized or ratified the wrongful acts." *Machen v. Childesburge Bancorp, Inc.*, 761 So. 2d 981, 984 (Ala. 2000) (citing *Potts v. BE & K Construction Co.*, 604 So. 2d 398, 400 (Ala. 1992)). Assuming *arguendo* that the conduct Roberts is accused of by Hanes did actually occur, such conduct was clearly not in the line and scope of his employment or in furtherance of the business of MIMC. *See e.g., Machen v. Childesburge Bancorp, Inc.*, 761 So. 2d 981, 984 (Ala. 2000)("[E]mployee's acts of sexual harassment were not committed in the line and scope of employment or in furtherance of the employer's business, but were merely to satisfy the defendant's own desires"); *Doe v. Swift*, 570 So. 2d 1209, 1210 (Ala. 1990)("[T]he test is whether 'it can be shown that the servant acted from wholly personal motives having no relation to the business of the master'."); *Joyner v. AAA Cooper Transportation*, 477 So. 2d 364, 365 (Ala. 1985) (where sexually harassing conduct was committed without knowledge of the employer and ceased as soon as the employer warned the offending employee, there was not a "scintilla of evidence to indicate that [the employee's] acts were within the line and scope of his employment of that they were in furtherance of [employer's] business.").

In addition, it is clear that once MIMC first learned of the allegations concerning Roberts, they conducted an investigation and took adequate steps to remedy the situation.  It is undisputed that there has not been a single allegation against Roberts since MIMC initially learned of the allegations on June 13, 2002.  Hanes has not presented any evidence that MIMC failed to take adequate steps to remedy the situation once she reported it  While she does not agree with the steps they took, she cannot legitimately deny they were successful. Therefore, Hanes has failed to present evidence that MIMC ever ratified the

conduct of Roberts such that it can be held liable for his alleged intentional torts, had such torts even been proven in this case.

## CONCLUSION AND ORDER

For the reasons stated above, the Court concludes and it is therefore **ORDERED** that defendants' motions for summary judgment are due to be and are hereby **GRANTED** and that **JUDGMENT** be entered in favor of the defendants, Mobile Infirmary Medical Center and William S. Roberts, and against the plaintiff, Melissa D. Hanes, the plaintiff to have and recover nothing of the defendants.  Costs are taxed against the plaintiff.

**DONE** this 2nd day of August, 2005.

_____s/ W. B. Hand_____
SENIOR DISTRICT JUDGE